# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 10-CR-104-CVE** |
| | ) | |
| TRACY DON CARTWRIGHT, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Now before the Court is Defendant's Motion to Suppress Statement and Brief in Support (Dkt. # 14) and Defendant's Motion to Suppress Evidence and Brief in Support (Dkt. # 15). Tracy Don Cartwright moves to suppress his statement about items in his possession on the ground that he was not warned of his Miranda rights prior to questioning by law enforcement officers at the time of his arrest. The government responds that the questioning was justified under the public safety exception to the Miranda requirement, and that defendant's statement is therefore admissible. Dkt. # 16. Cartwright also moves to suppress as evidence ammunition seized from his duffel bag because he claims it was the product of a warrantless search in violation of his Fourth Amendment rights. Dkt. # 15; Dkt. # 20. The government contends that because prison escapees have no reasonable expectation of privacy in their belongings, Cartwright has no Fourth Amendment rights to enforce. In the alternative, the government argues that the search of defendant's bag was a valid search incident to arrest.

# I.

On April 2, 2010, Cartwright escaped from Howard McLeod Correctional Center, a minimum security facility in Atoka, Oklahoma.  Kevin Newberry, an officer with the Oklahoma Department of Corrections (DOC) Fugitive Task Force, Internal Affairs Department (Task Force)[1], was assigned Cartwright's escape as his primary case, giving him the responsibility of locating and apprehending Cartwright.  An information charging Cartwright with Escape from Department of Corrections, a felony, was filed on April 5, 2010 in the District Court of Atoka County, State of Oklahoma.

At the time of his assignment, Newberry received an "escape packet" for Cartwright, which included an incident report regarding his escape and a field file with personal information. Newberry accessed further information about Cartwright on the DOC website, including contact information for family members.  That information showed that defendant has family members in Collinsville, Oklahoma.[2]  As part of his initial investigation, Newberry also exchanged information with his fellow Task Force members throughout the state, including DOC officers and agents assigned to the United States Marshals Service, Violent Crime Task Force.  Because Newberry had reason to believe that Cartwright might return to the Collinsville area, one of the Task Force members contacted was Jeremiah Daniels, a deputy for the Rogers County Sheriff's Office in Claremore, Oklahoma.  At some point prior to April 22, 2010 Newberry was contacted by a deputy in the Rogers County Sheriff's Office, who notified him that there had been an incident in Collinsville where a man matching the description of Cartwright pulled a weapon and demanded

---

[1]     Newberry has a dual commission as a United States Marshal.

[2]     Newberry testified that he had personally spoken to an aunt of Cartwright and was told that his family avoided contact with him.

money from a victim outside a residence.  Newberry was notified that Cartwright was considered a suspect in that case.

On April 22, 2010, Newberry's supervisor Johnny Blevins[3] received information from an unknown source that Cartwright had been making calls from a Tulsa area telephone.  The phone number used for those calls was connected to Terry Emerson, a Tulsa resident and previously convicted felon.  Upon making that connection, Blevins visited Emerson at home to ask him about Cartwright.  Emerson stated that he had driven Cartwright to the Super 8 Motel in Tulsa at 11th Street and Garnett, and that Cartwright was staying there with a woman named Bambi Asbury.  Emerson also told Blevins that Cartwright and Asbury had committed several burglaries, and that Asbury "ran off with the loot."

Blevins relayed the information received from Emerson, and Newberry went that same day to the Super 8 Motel where he had been told Cartwright was staying.  He obtained a registration card from the hotel clerk with Asbury's name, showing that she had checked in on April 19, 2010, and checked out on April 21, 2010.  Review of the phone records for the room registered to Asbury revealed two outgoing phone calls on April 21, 2010 made to Emerson.  Blevins remained with Emerson during Newberry's investigation of the Super 8, and during that time Emerson received a telephone call from Cartwright.  Cartwright told Emerson that he was at the Executive Inn, in room 201, and asked Emerson to pick him up before check-out at 11:00 a.m.  Upon receiving this

---

[3]        Blevins is the Administrator of the Internal Affairs Division of the DOC.

3

information from Blevins, Newberry notified the other Task Force officers in the area[4], and began surveillance of the Executive Inn. Blevins went to the surveillance location but remained in contact with Emerson. Cartwright continued to call Emerson several times asking him for a ride, but Blevins directed Emerson to stall and then eventually to stop answering his phone. At approximately 11:20 a.m., Cartwright exited the Executive Inn carrying a brown duffel bag, and started walking across the parking lot. Newberry identified Cartwright based on photos in the information he had previously received.

The surveillance team allowed Cartwright to exit the parking lot of the Executive Inn and walk into the parking lot of Priscilla's, a neighboring business. At that point, Newberry instructed the other Task Force officers to move in. They surrounded Cartwright in their vehicles and got out of their cars with firearms drawn and pointed at Cartwright, and Newberry told Cartwright to put the duffel bag down, show the officers his hands, and lay down on the ground. Newberry approached and asked the defendant for his name, and he responded that it was Tracy Cartwright. Newberry then handcuffed Cartwright, and asked "do you have anything illegal on you? Do you

---

[4]     The following officers were part of the surveillance team, in addition to Newberry and Blevins: Josh Petree with the Bureau of Alcohol, Tobacco, Firearms and Explosives; Scott Wagner with the Secret Service; Robert Hert with the Department of Corrections; Chad Hunt with the United States Marshals Service; and Brent Williams and Donny Pierce with the Tulsa Police Department.

have any weapons, guns, knives, anything that's going to poke me or stick me?"[5]  Cartwright responded that he did not have anything on him, but that there was ammunition in his bag.

At this point, Agent Petree joined the rest of the surveillance team at the scene, and Newberry told him about the statement made by Cartwright about there being ammunition in the bag but no guns.  Petree then removed the bag to what he deemed to be a "safe distance" (approximately eight feet) away from Cartwright, and conducted a search of the bag.  Inside, Petree found men's clothing, assorted toiletries, magazines, and the referenced box of .22 caliber ammunition. Defendant has been charged as a felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).  Dkt. # 2.

## II.

Defendant first seeks to suppress as evidence his statement that he had ammunition in his bag, arguing that it was obtained in violation of his rights under the Fifth Amendment.  The government responds that the statement is admissible under the public safety exception to Miranda.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  Because custodial interrogation generates "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he does not otherwise do so freely," the Supreme Court has established a protocol to safeguard a defendant's rights under the Fifth Amendment where such an

---

[5]     Newberry testified that this is the typical form in which he asks this question.  Defendant makes much of the fact that neither Newberry's question nor Cartwright's answer was included in Newberry's summary of the "Cartwright Apprehension," and that the question was similarly missing from the arrest report he prepared.  However, the Court finds Newberry credible and attaches no significance to such omissions by a state corrections officer who is by all accounts relatively unfamiliar with and untrained in matters of federal criminal prosecution.  The statement and defendant's answer did appear in the report of investigation by Josh Petree, a federal agent, prepared the day of the arrest.

interrogation takes place.  See Miranda v. Arizona, 384 U.S. 436, 467 (1966).  Custodial

interrogation is defined as "questioning initiated by law enforcement officers after a person has been

taken into custody or otherwise deprived of his freedom of action in any significant way."  Id. at

444.  Under Miranda, prior to custodial interrogation, law enforcement officers must warn a

defendant that "he has a right to remain silent, that any statement he does make may be used as

evidence against him, and that he has a right to the presence of any attorney, either retained or

appointed."  Id. at 444-45.

　　　Once an individual is placed under formal arrest, the protections of Miranda apply.

California v. Beheler, 463 U.S. 1121, 1125 (1983).  Here, Newberry placed Cartwright under formal

arrest.  At that point, the situation was a custodial interrogation, and would typically trigger the

Miranda requirement.  However, a number of exceptions to the Miranda requirement exist, including

the public safety exception.  See, e.g., New York v. Quarles, 467 U.S. 649, 659 (1984).  Under that

exception, a Miranda warning need not be given where police officers ask questions reasonably

prompted by a concern for public safety.  Id. at 656.  More specifically, the Tenth Circuit "has

applied the Quarles public safety exception to allow an officer to ask a suspect, '[d]o you have any

guns or sharp objects on you,' without first giving the Miranda warnings," as the question addresses

"a real and substantial risk to the safety of the officers and [d]efendant."  United States v. DeJear,

552 F.3d 1196, 1201 (10th Cir. 2009).  An officer will be found to have a reasonable belief that he

is in danger where, "at minimum, he [has] a reason to believe (1) that the defendant might have (or

recently have had) a weapon, and (2) that someone other than police might gain access to that

weapon and inflict harm with it."  Id. at 1201-02 (finding it reasonable for an officer to ask

defendant whether he had a weapon prior to arrest where defendant was seen stuffing something into

a car seat cushion, even where police were surrounding defendant with firearms and defendant had his hands in the air).  The test for reasonableness under the public safety exception is an objective one, not an inquiry into "the subjective motivation of the arresting officer."  Quarles, 467 U.S. at 656.

At the time of arrest, Newberry was aware Cartwright had escaped from prison and that he was suspected of having used a weapon to commit one or more burglaries in the Tulsa area.  It was therefore objectively reasonable to believe that the defendant might have or recently have had a weapon, and there was no way of knowing whether his duffel bag contained a weapon.[6]  Officer Newberry knew that Cartwright had reportedly been operating with an accomplice, and the arrest took place in a parking lot surrounded by many other businesses being patronized at the time, including several restaurants busy with a lunchtime crowd.  Although Cartwright was handcuffed at the time he made his statement, handcuffing a defendant has not been found to negate the public safety exception, as there remains a possibility of someone other than the police accessing any hidden weapon and inflicting harm with it.  See DeJear, 552 F.3d at 1201; see also, e.g., Quarles, 467 U.S. at 652; United States v. Lackey, 334 F.3d 1224, 1226-28 (10th Cir. 2003)[7].

---

[6]     Defendant disputes that the officers had a reasonable basis to believe that Cartwright had a gun based on the testimony of both Officer Newberry and Agent Petree that they were aware that there had been an eyewitness identification of a different suspect in connection with the Collinsville burglaries.  However, the mere fact that another suspect had been identified did not eliminate the possibility that Cartwright was in fact the perpetrator of those crimes.  Moreover, Cartwright's involvement in crimes of a similar nature was independently confirmed by Emerson.  Therefore, the officers had a reasonable basis for their belief that Cartwright may be armed.

[7]     Defendant preserves for appeal his argument that Lackey is wrongly decided and goes too far.  That argument was not fully presented to the Court, however, and because the Court's decision is based on many cases other than Lackey, it need not be addressed.

Thus, <u>Quarles</u> allowed Newberry to ask Cartwright if he had any weapons on him before giving him a <u>Miranda</u> warning.  Upon handcuffing Cartwright, Newberry asked, "do you have anything illegal on you?  Do you have any weapons, guns, knives, anything that's going to poke me or stick me?"  Although the phrasing of that question may have been inartful, it does not, as defendant argues, negate the applicability of the public safety exception.  Newberry's question was an inquiry into items in Cartwright's possession, not an attempt to probe the legality of that possession[8], and the public safety exception is not limited to a strict form of questions regarding weapons.  <u>See, e.g.</u>, <u>DeJear</u>, 552 F.3d at 1201-02 (holding that officer's questioning of defendant as to what he was stuffing under a seat without first giving proper <u>Miranda</u> warnings was excused under the public safety exception).  Cartwright does not allege that Newberry asked anything beyond the basic question regarding possession.  Thus, this case falls squarely within the public safety exception to <u>Miranda</u>, and defendant's motion to suppress his statement fails on that ground.

## III.

Cartwright also seeks to suppress the ammunition found as a result of his statement, claiming that its recovery from his duffel bag during a warrantless search violated his Fourth Amendment right to be "secure in [his] person, house[], papers and effects, against unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.  The government argues that, as an escaped convict, Cartwright had no reasonable expectation of privacy under the Fourth Amendment, and that the

---

[8]   Newberry testified that this is the form in which he always asks arrestees about items in their possession.  Because the possession of legal items could present a grave danger to an officer in certain situations, the Court finds it implausible to interpret Newberry's statement as an attempt to interrogate about illegal possession, or as anything other than an attempt to locate items that may inflict harm on him or other officers.

search of his bag was therefore valid.  In the alternative, the government argues that the warrantless

search of Cartwright's bag was allowable under the search incident to arrest exception to the search

warrant requirement.

## A.

In analyzing rights under the Fourth Amendment, courts must "examine the totality of the

circumstances to determine whether a search is reasonable." Samson v. California, 547 U.S. 843,

848 (2006)(internal citations omitted).  "Whether a search is reasonable is determined by assessing,

on the one hand, the degree to which it intrudes upon an individual's privacy, and, on the other, the

degree to which it is needed for the promotion of legitimate governmental interests." Id.  Courts

have satisfied that balancing requirement through application of a two-part test for reasonableness

of a search under the Fourth Amendment: "(1) whether the defendant manifested a subjective

expectation of privacy in the area searched and (2) whether society is prepared to recognize that

expectation as objectively reasonable." United States v. Johnson, 584 F.3d 995, 999 (10th Cir.

2009).

The Supreme Court has not considered what reasonable expectation of privacy an escaped

convict has in his possessions.  However, it has provided bookends for that discussion with its

decisions in Hudson v. Palmer, 468 U.S. 517 (1984), which held that prisoners did not have a

reasonable expectation of privacy in their cells, and United States v. Knights, 534 U.S. 112 (2001),

which considered the question as applied to probationers.  Those cases implicate points "on a

continuum of possible punishments ranging from solitary confinement in a maximum-security

facility to a few hours of mandatory community service." Knights, 534 U.S. at 848.  The location

on that continuum helps to determine the reasonableness of any expectation of privacy.

In <u>Hudson</u>, the defendant filed suit against a police officer who had conducted an unannounced search of his prison cell.  468 U.S. at 519-20.  In its decision, the Court considered whether "a prison inmate has a reasonable expectation of privacy in his prison cell entitling him to the protection of the Fourth Amendment against unreasonable searches and seizures."  <u>Id.</u> at 519. It noted that while "prisons are not beyond the reach of the Constitution . . . it is also clear that imprisonment carries with it the circumscription or loss of many significant rights," and that "constraints on inmates, and in some cases the complete withdrawal of certain rights, are justified by the considerations underlying our penal system."  <u>Id.</u> at 523-24.  The Court acknowledged that prisons are places of confinement for persons who have demonstrated an inability to conform to social norms, and examined the institutional concerns regarding security and control that motivate searches of inmates.  <u>Id.</u> at 526-30.  Weighing those interests against any interest of the inmate in not being subject to random searches, it found that society was not prepared to recognize as reasonable any expectation of privacy for inmates.  <u>Id.</u> at 526.  As Justice O'Connor noted, "[t]he fact of arrest and incarceration abates all legitimate Fourth Amendment privacy and possessory interests in personal effects, and therefore all searches and seizures of the contents of an inmate's cell are reasonable."  <u>Id.</u> at 538 (O'Connor, J., concurring)(internal citations omitted).

In <u>Knights</u>, the Court considered whether a warrantless search of a probationer violated his Fourth Amendment rights.  In that case, one of the conditions to the defendant's probation allowed him to be searched any time, with or without a search warrant.  534 U.S. at 114.  When an officer who believed the defendant to have been involved in several crimes searched his garage without a warrant, he found evidence of those crimes.  <u>Id.</u> at 115.  The defendant sought to suppress the evidence on the ground that it violated his Fourth Amendment rights.  However, the Court found that

the search was reasonable, as "[i]nherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled," and, therefore, "[j]ust as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." Id. at 119.  The Court cited high rates of recidivism on the part of past offenders as support for the governmental interest in warrantless searches, noting that "probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal . . . ." Id. at 120.  Weighing the community interests against those of the defendant, the Court decided that a search of a probationer's belongings requires no more than reasonable suspicion on the part of the officer.  Id. at 121.

The question now before the Court is where to place Cartwright on the continuum of punishment between a convict in his cell and a probationer.  The Court finds that there should be no functional difference between Cartwright and the prisoner in Hudson, as a prisoner may not alter the terms of his imprisonment by means of escape.  Although the question is one of first impression in this jurisdiction, other circuits have held that one who effects his own escape does not gain the benefit of additional constitutional protections.

In United States v. Roy, 734 F.2d 108 (2d Cir. 1984), officers performing surveillance on a shopping center stopped a man in his car based on their suspicion that he was attempting to commit a robbery.  He was arrested, and after the officers removed him from his car they proceeded to conduct a search of the vehicle.  Id. at 109.  The defendant moved for suppression of the evidence found as a result of the warrantless search.  Id.  However, although unknown to the officers at the time of arrest, the defendant was an escaped felon.  Id.  In its review of the officers' search, the court

said that its "threshold question [wa]s whether [defendant], as an escaped felon, had a legitimate expectation of privacy in the automobile that was violated by the search which occurred." Id. at 110. Although the court found the defendant had a subjective expectation of privacy in his car, it analogized the situation to the lack of rights owed trespassers and held that "[a]t the time of the search and seizure, [defendant] was no more than a trespasser on society." Id. at 110-11.  He had lost the ability to challenge the acts of others based on rights that had been taken from him at the time of imprisonment.  The court found there was "no question" that the search could have been conducted without probable cause inside the prison.  Id.  at 111.  As such, "it [did] not follow that [defendant] could expand his legitimate expectations of privacy by escaping"; finding otherwise could actually serve to encourage prisoners to escape and would not serve societal interests in protecting the public.  Id. at 112.

Similarly, in United States v. Ward, 561 F.3d 414 (5th Cir. 2009), officers apprehended an escapee in his hotel room and searched a small bag that was found to contain a weapon.  The question before the court was whether the escapee "had a right of privacy . . . entitling him to the protection of the Fourth Amendment against unreasonable searches." Id. at 416.  Applying Hudson, the court noted that the lack of rights held by a defendant in his prison cell "does not *a fortiori* mean that he has no right to privacy in his motel room," as the interests of an escapee might differ from those of the prisoner.  In particular, it noted that much of Hudson's reasoning was based on institutional needs and interests within the prison.  Id. at 417-18.  However, it found that the institutional needs relied on in Hudson would be furthered by not encouraging escape via the provision of expanded rights to escapees.  Id. at 418.  Moreover, aside from those institutional concerns, the court found that "deprivation of privacy is a component of society's punishment," and

12

that "[a] prisoner cannot by escape rewrite his sentence such that his punishment no longer includes a loss of Fourth Amendment protected privacy." Id. Those institutional concerns and societal interests justified holding "that prison escapees cannot invoke the protections of the Fourth Amendment." Id. at 419.

The finding that escaped prisoners have no reasonable expectation of privacy has been echoed by other courts and scholars. See, e.g., United States v. Lucas, 499 F.3d 769, 779 (8th Cir. 2007)(finding that escaped convict "had no legitimate expectation of privacy while hiding out in [a friend's] residence"); United States v. Gutierrez-Casada, 553 F. Supp. 2d 1259, 1268 (D. Kan. 2008)("[t]he rationale for [finding trespass cases applicable to fugitive cases] is based upon the facts [sic] that escapees are not legitimately on any premises but prison grounds, and while on prison grounds they have no Fourth Amendment rights"); United States v. Randolph, 210 F. Supp. 2d 586, 589-91 (E.D. Pa. 2002)(noting that it was "inconceivable that a convicted fugitive could be in any better Fourth Amendment position than a probationer" [as in Knights] and finding that "a sensible rule" was that "all law enforcement officers need to do is to identify the fugitive and then they are free to search whatever area he has occupied during his fugitive status"); State v. Amos, 450 N.W.2d 503, 507 (Wis. 1989)("[a]s a matter of policy, society is not prepared to recognize an escaped prisoner's expectation of privacy as reasonable"); State v. Hiott, 276 S.E.2d 163, 166 (S.C. 1981)("[defendant's] Fourth Amendment rights were no greater as an escapee than they were while he was within the confines of the penitentiary"); Jonathan Drimmer, When Man Hunts Man: The Rights and Duties of Bounty Hunters in the American Justice System, 33 Hous. L. Rev. 731, 793 (1996)("[c]ourts generally claim that persons who have escaped confinement have no reasonable expectation of privacy under the Fourth Amendment because prisoners can only expect privacy

13

where they legitimately belong (i.e. within their jail cells)").  In the context of other constitutional rights, courts have similarly found that an escapee should receive the same status as one still incarcerated, as any other result would be unjust.  See, e.g., Brothers v. Kevenhagen, 28 F.3d 452, 457 (5th Cir. 1994)(finding that for Due Process Clause purposes, once an individual had been transferred to a jail cell, he remained legally a pretrial detainee regardless of escape; "[a]ny other conclusion would lead to the anomalous result of pretrial escapees[] receiving greater protection than those detainees who peacefully remain in their cells").

This Court finds these opinions persuasive, and similarly rejects the idea that society accepts any reasonable expectation of privacy on the part of an escaped prisoner. One who is convicted of a crime must receive the placement on the continuum of punishment dictated by society, along with whatever "withdrawal or limitation of . . . privileges and rights" that incarceration may entail. McKune v. Lile, 536 U.S. 24, 26 (2002).  Part of the cost imposed on prisoners is the loss of certain liberties, and an individual may not alter the terms of his punishment by successfully escaping the bounds of confinement.  Ensuring that the proper retributive goal of imprisonment is satisfied requires equality of terms of punishment between escapees and prisoners.  United States v. O'Driscoll, 761 F.2d 589, 599 (10th Cir. 1985).

Under Hudson, Cartwright would have had no Fourth Amendment protections for the search of his bag if the search had occurred on prison grounds.  It would be incongruous for an escaped convict to obtain greater rights upon freeing himself from incarceration than he would have had in prison. The policies relied upon in Hudson to justify limiting the rights of prisoners also justify a refusal to extend those rights to escapees.  As noted in Ward, institutional interests of penal institutions in maintaining security could be damaged by providing prisoners with encouragement

to escape.  And the <u>Hudson</u> Court's acknowledgment that prisoners have already shown themselves unable to conform to social norms provides support both for establishing policies to prevent escape and for erecting no barriers to returning prisoners to confinement upon their escape.  <u>Knights</u> also supports a refusal to extend rights to escapees not given to those who remain in confinement.  The concerns expressed in that case regarding risk of recidivism and incentives to conceal criminal activity that justified the removal of certain Fourth Amendment protections from probationers apply all the more strongly in the case of escaped prisoners.  Institutional interests in maintaining order and social interests in promoting public safety apply equally to inmates and escapees.  Thus, the extension of greater constitutional protections to the latter group simply on the basis of its members' decisions to reject punishment society has deemed appropriate for them would be both unfair and insensible.

While defendant would have this Court focus on the non-violent nature of his escape from confinement or the lack of consent to search present in <u>Knights</u>, neither factor is relevant. Cartwright, who under <u>Hudson</u> had no reasonable expectation of privacy in his belongings while incarcerated, did not regain those rights once he made an unauthorized departure from his correctional institution.  The motion to suppress is denied on this ground.

**B.**

Moreover, even if Cartwright had possessed full Fourth Amendment rights at the time of his arrest, the government argues that the ammunition should not be suppressed because Agent Petree's

search of the duffel bag qualifies as a search incident to Cartwright's arrest.[9] "[S]earches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." Arizona v. Gant, 129 S.Ct. 1710, 1716 (2009). The search incident to a lawful arrest exception permits a search of "the arrestee's person and the area within his immediate control" or "the area into which an arrestee might reach in order to grab a weapon or evidentiary items." Chimel v. California, 395 U.S. 752, 763 (1969). The justification for the exception derives from "interests in officer safety and evidence preservation that are typically implicated in arrest situations." Gant, 129 S. Ct. at 1716.

Defendant argues that the Supreme Court's recent formulation of the search incident to arrest exception in Gant bars a finding of a proper search in this case. Gant discussed the search incident to arrest exception in the context of a vehicle search and had as its main purpose the clarification of New York v. Belton, 453 U.S. 454 (1981), which also involved the search of a vehicle. In interpreting the goals of Chimel in the vehicle search context, the Gant Court narrowed the scope of the search incident to arrest exception, clarifying that warrantless searches in connection with a valid arrest will not be permitted where the defendant is secured and the police "could not reasonably have believed . . . that [the arrestee] could have accessed" the vehicle at the time of the

---

[9]    The government does not argue that Petree's search constituted a protective sweep, and the Court does not consider defendant's argument on that ground. Dkt. # 20, at 4. Moreover, while both parties have cited United States v. Patane, 542 U.S. 630 (2004), and United States v. Rogers, 391 F.3d 1165 (10th Cir. 2004), in their Fourth Amendment briefings, these cases are relevant to suppression of evidence under the Fifth Amendment, and will not be addressed. Dkt. # 17; Dkt. # 20, at 2, 4.

search. 129 S. Ct. at 1719.[10] Two circuits have reached differing conclusions as to how to apply the restrictive standard set forth in <u>Gant</u> outside the context of automobile searches.[11] <u>See, e.g.</u>, <u>United States v. Perdoma</u>, 2010 WL 3528579, at * 5-6 (8th Cir. Sept. 13, 2010)(finding that while the "explanation in <u>Gant</u> of the rationale for searches incident to arrest may prove to be instructive outside the vehicle-search context in some cases," it was not helpful in determining the propriety of a warrantless search of a bag)[12]; <u>United States v. Shakir</u>, 2010 WL 3122808, at * 4-5 (3rd Cir. Aug. 10, 2010)(applying <u>Gant</u> to search of a bag on the floor next to a handcuffed defendant).

In <u>Perdoma</u>, an officer followed a man into a bus terminal, approached him, and began asking questions. 2010 WL 3528579, at * 1. After smelling the odor of marijuana on him and witnessing the man's suspicious behavior, the officer suspected that he was involved in criminal activity. <u>Id.</u> When the officer asked for identification from the man, he began to run; the officer gave chase, and the man was caught, handcuffed, and led to the rear of the terminal where the officer

---

[10]   Thus, <u>Gant</u> found that where a defendant was arrested, handcuffed, and locked in the back of a police patrol car, the search incident to arrest doctrine did not justify the police officers' warrantless search of the defendant's car, as there was no reasonable basis for believing that the defendant could have gained access to anything within it. 129 S. Ct. at 1714, 1719.

[11]   District courts that have considered whether <u>Gant</u> applies outside the scope of vehicle searches have similarly reached different conclusions, even within a jurisdiction. <u>See</u>, <u>e.g.</u>, <u>United States v. Bennett</u>, 2010 WL 1427593, at * 5 (E.D. Pa. April 8, 2010)(finding that search of backpack was not a valid search incident to arrest under <u>Gant</u>); <u>United States v. Snard</u>, 2009 WL 3105271, at * 11 (E.D. Pa. Sept. 27, 2009)(rejecting argument that <u>Gant</u> applied to search of bed); <u>United States v. Scott</u>, 2009 WL 4975269, at * 7 (S.D.N.Y. June 8, 2009)(finding that search of a backpack was permissible search incident to arrest under <u>Gant</u>); <u>United States v. Rouse</u>, 2009 WL 1550860, at * 6 n.8 (S.D. Ga. June 1, 2009)(applying <u>Gant</u> analysis to search of a laundry basket inside a residence).

[12]   Although the <u>Perdoma</u> court first stated that it would not address the issue of whether <u>Gant</u> was applicable in non-vehicle searches because it had not been properly raised by the parties, it did partially interpret <u>Gant</u>'s scope in its response to the dissent. 2010 WL 3528579, at * 4-5.

searched him and a bag he was carrying.  Id.  The defendant argued that the warrantless search of his bag violated his Fourth Amendment rights in light of the holding in Gant.  Id. at * 3.  However, the court decided that the rationale of Gant did not preclude a finding that a search of a bag near a handcuffed defendant with two officers present was a valid search incident to arrest.  Id. at * 6.  It noted that in the non-vehicle context, "it may be possible for an arrestee restrained in a room to reach items in that room," and found the defendant had made no showing as to why the Court's reasoning in Gant relating to a search of a vehicle should apply.  Id.  Therefore, it found the search to be valid under the search incident to arrest exception without further consideration of the Gant rationale.

Similarly, Shakir involved the search of a bag on the ground next to a defendant who, though handcuffed and restrained by two policemen at the time his bag was searched, was in a public place and had the bag beside him.  2010 WL 3122808, at * 1.  The Third Circuit applied Gant in a non-vehicle context to find that a search of a bag on the ground next to a handcuffed defendant was a valid search incident to arrest where the arrest occurred in public, police were concerned about possible accomplices, and the officer searching the bag remained at the scene of the arrest and testified that his "chief concern in searching the bag was to prevent any weapons that might be inside from being used to injure police or the innocent bystanders. . . ."  Id. at * 4-6.  The Shakir court interpreted Gant to "stand for the proposition that police cannot search a location or item when there is no reasonable possibility that the suspect might access it," not as meaning that once a defendant is restrained by handcuffs and officers that no valid search incident to arrest may occur.  Id. at 5.

The Tenth Circuit has not yet spoken as to whether Gant extends beyond vehicles.  However, this Court finds the reasoning in Perdoma and Shakir persuasive in their holding that in the non-

vehicle context, <u>Gant</u> requires more than an inquiry simply into whether the defendant was restrained.  Further, it adopts <u>Shakir</u>'s finding that the standard for a defendant's ability to access an area remains a lenient one after <u>Gant</u>.  2010 WL 3122808, at * 6.  <u>Gant</u> did, however, refocus the search incident to arrest inquiry on the <u>Chimel</u> factors of officer safety and evidence preservation, and this Court will therefore consider whether those goals were furthered in deciding the propriety of the search in this case.

Here, Agent Petree picked up the duffel bag, which Cartwright had described as containing ammunition, and moved it approximately eight feet away from the defendant before performing his search.  Cartwright was handcuffed at the time, and there were other officers on the Task Force surveillance team standing in close proximity to him.  Thus, Cartwright's access to the bag would have been severely limited.  However, in a search incident to arrest inquiry, "the fact that the detainee is under the control of officers does not eliminate the risk that he will gain access to a weapon."  <u>United States v. Rollins</u>, 2006 WL 3007493, at * 3 (10th Cir. Oct. 17, 2006)[13]. Cartwright's arrest occurred in a public place, and both Officer Newberry and Agent Petree testified that the businesses surrounding the scene of arrest were heavily patronized.  The officers had been told that Cartwright was committing crimes in partnership with another individual, and a search of hotel records confirmed that the individual had been with Cartwright recently.  Control of the scene would have required ensuring that there were no weapons which could have been accessed by Cartwright or anyone else in an escape attempt.  That Cartwright told Officer Newberry he had only ammunition but not a gun is irrelevant, as an officer who has reason to believe a weapon is present is not required to take a defendant at his word as to the contents of a bag.  To the contrary, Agent

---

[13]     Unpublished decisions are not precedential, but may be cited for their persuasive value. <u>See</u> Fed. R. App. 32.1; 10th Cir. R. 32.1.

Petree testified that based on his experience and training, where a prison escapee makes a statement that he has ammunition, there is usually a gun as well.[14]  Given that Cartwright was confined only by handcuffs, members of the public were present, and there was a possibility of an accomplice, an objectively reasonable possibility of access to the bag remained in the area in which Agent Petree conducted the search of Cartwright's bag, and the search was justified as one incident to arrest.  See id.; see also Shakir, 2010 WL 3122808, at * 5.

This conclusion is not altered by Agent Petree's movement of the bag from its original location.  Although it diminished the chance of access by Cartwright, where concerns about accomplices and officer safety justify the opening of a bag it would be nonsensical to require that an officer leave the bag exactly in its original location to qualify under the search incident to arrest exception.  Importantly, while Petree moved the bag from the ground next to the defendant to a location eight feet away, he never left the scene and his search was still incident to the arrest of Cartwright.  Safety concerns may dictate that an officer move a bag with a suspected weapon in it away from others prior to conducting a search.  It is those safety concerns that provide the justification for the search incident to arrest exception, and it would be ill-advised to attempt to formulate a precise distance at which a search is no longer a valid under that doctrine.

Because the Court confines its holding to searches contemporaneous in time with the arrest, it does not undermine the purpose of the search incident to arrest exception.  Insofar as Gant is applied outside the vehicle context, this Court reads it as refocusing the search incident to arrest

---

[14]    Defendant attempts to discount this knowledge of Cartwright's possession by arguing that the commission of a crime does not justify a generalized search for evidence under Mincey v. Arizona, 437 U.S. 385 (1978).  While this Court agrees, Mincey addressed the creation of a separate crime scene exception to the warrant requirement and involved a four-day search of the scene of a murder.  Its reasoning is not applicable here.

analysis on the underlying goals of officer safety and evidence preservation rather than an absolute inquiry into access to the area by the defendant.  Where, as here, the mere fact of restraint does not remove all possibility of access by the defendant and a search is justified by officer safety concerns, that search will not be barred by Gant.[15]  Thus, Agent Petree's search of Cartwright's bag was justified as a search incident to defendant's arrest.[16]

## C.

However, even if the search incident to arrest doctrine does not provide an exception to the warrant requirement, defendant's motion for suppression of the ammunition would fail under the inevitable discovery rule.  Task Force officers arresting Cartwright would have been required to inventory the contents of his bag when he was returned to Howard McLeod Correctional Center.[17] At that point, the ammunition would have been discovered.  "The inevitable discovery doctrine provides an exception to the exclusionary rule and permits evidence to be admitted if an

---

[15]    Because the Court finds that Agent Petree had an objectively reasonable belief that a search of the bag, an "area into which [defendant] might reach in order to grab a weapon or evidentiary items," was necessary for safety reasons, defendant's argument that the search was barred by United States v. Chadwick, 433 U.S. 1 (1977), fails, as Chadwick prevents such a search only where a proper exigency was not present.

[16]    Defendant elicited testimony from Agent Petree that he could have taken the bag back to the field office prior to performing his search.  However, Petree's ability to take a different course of action is not part of the analysis for a valid search incident to arrest.  Where concerns about officer safety exist because of potential access by a defendant, a warrantless search is allowed regardless of whether the officer could have taken a different course.

[17]    Officer Newberry testified that DOC regulations require officers to take away all property from escapees upon their arrest.  Moreover, DOC regulations provide for the inventory of all personal property in an offender's possession upon arrival at a correctional facility.  See Oklahoma Department of Corrections Policy and Operations Manual, OP-030120, "Assessment and Reception," http://www.doc.state.ok.us/Offtech/op030120.pdf.  After his arrest, Officers Newberry and Hert immediately transferred custody of Cartwright back to officers from McLeod Correctional Center.

independent, lawful police investigation would have discovered it." United States v. Martinez, 512 F.3d 1268, 1273-74 (10th Cir. 2008). To avail itself of the inevitable discovery rule, the government must show by a preponderance of the evidence that the evidence would have been discovered without a Fourth Amendment violation. Id.

A search of a defendant's vehicle or belongings for purposes of inventorying the contents subsequent to arrest is a long-acknowledged exception to the warrant requirement. See United States v. Lugo, 978 F.2d 631, 636 (10th Cir. 1992). Such an inventory search "does not offend Fourth Amendment principles so long as the search is made pursuant to 'standard police procedures' and for the purpose of 'protecting the [property] and its contents.'" Id. (citing South Dakota v. Opperman, 428 U.S. 364, 369 (1975)). To ensure that inventory searches do not become a "ruse for a general rummaging in order to discover incriminating evidence," such searches must be governed by "standardized criteria." Id. The Tenth Circuit has affirmed that the inevitable discovery doctrine may apply in "the context of an illegal search which preceded lawful impoundment and inventory." See United States v. Haro-Salcedo, 107 F.3d 769, 773 (10th Cir. 1997); see also United States v. Souza, 223 F.3d 1197, 1203 (10th Cir. 2000).

Defendant argues that Souza should be read to stand for the proposition that the inevitable discovery doctrine does not apply where the "police had probable cause to conduct a search but simply failed to obtain a warrant." Dkt. # 20, at 6. However, the Court need not examine this issue in terms of the officers' ability to obtain a warrant. The court in Souza took pains to distinguish cases like this one – where "legal doctrines providing exceptions to the warrant requirement" like an inventory search after arrest "would have inevitably led to discovery of the evidence" – from those where officers simply conducted a premature search without a warrant. 223 F.3d at 1203-05.

Thus, the fact that the Task Force officers could have obtained a search warrant for the bag is irrelevant, because under the inevitable discovery doctrine suppression of the ammunition is unnecessary if it would have ultimately been found by officers acting under normal procedures.

As noted, DOC regulations dictate that upon returning Cartwright to the institution, the officers or other facility personnel were required to inventory his belongings.  This procedure is standardized and governed by regulation; it is not permissive of "general rummaging."  Although examination of the bag by Agent Petree at the scene of the arrest was not done as part of an official inventory, his actions were identical to what would have been done in an official inventory.[18]  Thus, the ammunition in the duffel bag would have been found upon defendant's return to a penal institution.  Because the inevitable result of Cartwright's fugitive status was that upon recapture his belongings would have been immediately inventoried, there is no reason for this Court to exclude the ammunition as evidence.

## IV.

In conclusion, Cartwright's un-Mirandized statement regarding the ammunition in his bag does not require suppression because of the public safety interests of Officer Newberry in asking Cartwright if he had any weapons.  Moreover, as an escaped convict, Cartwright had no reasonable expectation of privacy in his personal effects, and suppression of the ammunition found in his bag is similarly unnecessary.  Even if Cartwright were found to have a reasonable expectation of privacy, the search of his bag was a search incident to arrest, for which no warrant is required.  Finally, the ammunition would have been found during an inventory search upon Cartwright's return to the

---

[18]     In Lugo, the court found that because searching behind a door panel of a car was not standard police procedure in an inventory, that exception to the warrant requirement did not apply.  978 F.2d at 637.

penal institution.  Therefore, suppression of the statement and the evidence is not required.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Statement and Brief in Support (Dkt. # 14) and Defendant's Motion to Suppress Evidence and Brief in Support (Dkt. # 15) are **denied.**

**DATED** this 5th day of October, 2010.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT